IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 09-cv-00354-CMA-BNB

GREGG JOSEPH SAVAJIAN, #125166

Plaintiff,

v.

KEVIN MILYARD, Warden, Sterling Correctional Facility,
PHYSICIAN'S HEALTH PARTNERS, Facility Medical Provider,
DR. J. G. FORTUNADO, Staff Supr. Physician (PHP),
BRIAN WEBSTER, Physician's Asst. (PHP),
BEVERLY DOWIS, Facility Medical Administrator (PHP), and
OFFICER CHRIS WADE, Facility Transport Driver,

Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

This matter arises on the following motions:

1. **Defendants' Motion for Summary Judgment** [Doc. #139, filed 12/31/2009] (the "Motion") filed on behalf of defendants Milyard, Physicians Health Partners, Fortunado, Dowis, and Wade; and

2. **Defendant Brian Webster's Motion for Summary Judgment** [Doc. #169, filed 03/12/2010] (the "Webster Motion"), filed on behalf of defendant Brian Webster.

I respectfully RECOMMEND that the motions be GRANTED.

## I.  STANDARD OF REVIEW

The plaintiff is proceeding *pro se*, and I must liberally construe his pleadings.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972).  I cannot act as advocate for a *pro se* litigant, however,

who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence. <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). Rule 56(c), Fed. R. Civ. P., provides that summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 447 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." <u>Trainor v. Apollo Metal Specialties, Inc.</u>, 318 F.3d 976, 979 (10th Cir. 2002).

The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 447 U.S. at 324. Only admissible evidence may be considered when ruling on a motion for summary judgment. <u>World of Sleep, Inc. v. La-Z-Boy Chair Co.</u>, 756 F.2d 1467, 1474 (10th Cir. 1985).

Affidavits must be based on personal knowledge and must set forth facts that would be admissible in evidence. Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." Id.

## II.   UNDISPUTED MATERIAL FACTS[1]

1.   The plaintiff is currently incarcerated by the Colorado Department of Corrections ("DOC") at the Sterling Correctional Facility ("SCF"). *Motion*, p. 2, ¶ 1; *Plaintiff's Motion in Response to Defendant's Motion for Summary Judgement . . .* [Doc. #172] (the "Response"), p. 1, ¶ 1.

2.   On November 8, 2006, the plaintiff was seen in the SCF medical department after he submitted a kite complaining of lower back pain. After a physical examination, Kathryn Rittenhouse prescribed naproxen and ibuprofen for the plaintiff's pain. *Motion*, p. 7, ¶ 26; *Response*, p. 5, ¶ 26.

3.   The plaintiff informed SCF medical staff that prior to his incarceration he went to Lutheran Hospital, had an MRI in 2000, and was scheduled for back surgery when he was arrested. The SCF medical staff had the plaintiff sign a release in order to obtain a copy of the MRI. *Motion*, p. 8, ¶ 27; *Response*, p. 5, ¶ 27.

4.   The plaintiff was seen on January 12, 2007, for renewal of pain medications. A copy of the MRI was received, and it showed multi-level mild disc bulges. Defendant Brian Webster, Physician Assistant, discussed the MRI results with the plaintiff and prescribed Robaxin, a muscle relaxant. *Motion*, p. 8, ¶ 28; *Response*, pp. 5-6, ¶ 28; *Webster Motion*, p. 2, ¶ 50;

---

[1]The plaintiff disputes many of the defendants' facts, and he asserts numerous additional facts of his own. However, he seldom provides evidentiary support for his version of the facts. I do not consider factual statements that are unsupported by evidence.

*Plaintiff's Response to Defendant Webster's Motion For Summary Judgment . . .* [Doc. #177] (the "Webster Response"), p. 2, ¶ 51..

5.   On August 13, 2007, defendant Webster responded to a kite sent by the plaintiff wherein he complained of recurrent low back pain.  Webster examined the plaintiff and noted that his gait was brisk, he arose from a chair and sat on the exam table without difficulty, but he was tender over the medial left paralumbar muscle.  Webster prescribed Motrin and Robaxin. *Motion*, p. 8, ¶ 29; *Response*, p. 6, ¶ 29.

6.   The plaintiff was examined by Dr. Goldsmith on November 20, 2007.  Based on Dr. Goldsmith's examination, a neurosurgery consult was requested from Physician Health Partners ("PHP").  *Motion*, p. 8, ¶ 30; *Response*, p. 6, ¶ 30.

7.   PHP is a third-party Health Services Administrator used by the DOC to evaluate the medical necessity of requests made by DOC medical providers.  *Motion*, p. 5, ¶ 15; *Response*, p. 3, ¶ 15.  The DOC has a well-defined and mandated database process that must be completed in full for each referral submitted to PHP.  PHP is mandated by the DOC to deny referrals that contain inadequate documentation.  *Motion*, p. 5, ¶ 16; *Response*, p. 3, ¶ 16.

8.   PHP approved Dr. Goldsmith's request for a neurosurgery consult on November 29, 2007.  *Motion*, p. 8, ¶ 31; *Response*, p. 6, ¶ 31.

9.   Dr. Goldsmith examined the plaintiff again on January 3, 2008.  The neurosurgery consult was scheduled for February 5, 2008, and Dr. Goldsmith determined that a new MRI was needed.  *Motion*, p. 9, ¶ 32; *Response*, p. 6, ¶ 32.  PHP approved Dr. Goldsmith's referral for an MRI the following day.  *Motion*, p. 9, ¶ 33; *Response*, p. 6, ¶ 33.

10.  The plaintiff received the MRI on January 7, 2008.  *Motion*, p. 9, ¶ 34; *Response*, p. 7, ¶ 34.

11.  Webster requested a pain management office visit for the plaintiff through PHP on January 10, 2008.  PHP approved the pain management office visit on January 15, 2008. *Motion*, p. 9, ¶ 35; *Response*, p. 7, ¶ 35.

12.  Defendant Wade is employed by the DOC as a Correctional Officer.  On February 5, 2008, he was working as a transport driver/officer escort at SCF, and was assigned to transport the plaintiff and another inmate, Glen Kemp, from SCF to the Denver Health Center.  *Motion*, pp. 2-3, ¶ 2; *Response*, p. 2, ¶ 2.

13.  Upon arrival in Denver, the weather was sunny with very little wind, and all roads were open.  *Motion*, p. 3, ¶ 3; *Response*, p. 1, ¶ 3 and p. 10, ¶ 2.

14.  When the transport van reached Arapahoe Road, Wade encountered icy road conditions.  The van traveled downhill on Arapahoe Road at approximately 25 miles per hour. Several vehicles were stopped in the traffic lane ahead of the van.  As Wade applied the brakes, the van continued forward, sliding on the icy road.  Wade was unable to completely stop the van, and the van hit a truck.  The van stopped, and the truck moved forward and collided with other vehicles.  *Motion*, p. 3, ¶¶ 4-5; *Response*, pp. 1-2, ¶¶ 4-5.

15.  As a result of the accident, Wade received a traffic citation for following too closely. *Motion*, p. 4, ¶ 8; *Response*, p. 2, ¶ 8.

16.  After the Denver police cleared the van, Wade proceeded to the Denver Health Center where the inmates were seen for their appointments.  Id.  The plaintiff met with the neurosurgery specialists, and the results of the 2008 MRI were discussed with the plaintiff.  The

MRI revealed a central herniated disk and an annular tear with some herniation of the disk material towards the left. *Motion*, p. 9, ¶ 36; *Response*, p. 7, ¶ 36.

17. When the plaintiff and Mr. Kemp were finished with their medical appointments, they were driven back to SCF. *Motion*, p. 4, ¶ 9; *Response*, p. 2, ¶ 9.

18. Warden Kevin Milyard was told that Wade did not report any injuries based on the plaintiff's claims, Wade's observations, the verbal opinion of the emergency responders, and the professional opinion of the medical staff that saw the plaintiff at his scheduled appointment. *Motion*, p. 4, ¶ 10; *Response*, p. 2, ¶ 10.

19. The plaintiff sought medical treatment the following day "to have a full examination of the possibility of increased pain I was suffering." *Motion*, p. 4, ¶ 11; *Response*, pp. 2-3, ¶ 11 and Ex. 1 (Savajian Affidavit). He was examined by defendant Webster and nurse Smith. Webster discussed with the plaintiff the neurosurgery recommendations for surgery and pain management. *Motion*, p. 9, ¶ 38; *Response*, p. 7, ¶ 38. Webster documented that he submitted approval for "Non-Formulary" Neurontin, 800 mg. for 180 days. *Motion*, Ex. A-6, pp. 10, 12.[2] The nurse documented that the plaintiff "[d]enies any discomfort or pain until this am" and listed his injuries as a "1.5 cm. bruise" and "difficulty flexing [left] knee." *Motion*, p. 4, ¶ 11 and Ex. A-6, pp. 10-11; *Response*, pp. 2-3, ¶ 11.

20. A request for ambulatory surgery was submitted to PHP by Dr. Goldsmith on February 8, 2008, and was approved the same day. *Motion*, p. 10, ¶ 39; *Response*, p. 7, ¶ 39.

---

[2]I cite to the page numbers of the defendants' exhibits as they are assigned by the court's docketing system.

21.     The plaintiff was seen at the Red Rocks Center for Rehabilitation on February 22, 2008, for a comprehensive evaluation of his back pain and his left knee pain.  Physician Assistant Terri Thorn and Dr. Jeffrey Kesten determined that an EMG would give more definitive information regarding the plaintiff's back pain.  They further determined that the plaintiff had bursitis in his left knee and that the knee was "very stable."  *Motion*, pp. 4-5, ¶ 12; *Response*, p. 3, ¶ 12.  Dr. Kesten opined that back surgery "would not be the first choice at this point because noninvasive, nonsurgical treatment has not been pursued at this point." *Motion*, p. 10, ¶ 39 and Ex. A-6, p. 15; *Response*, p. 7, ¶ 39.

22.     The plaintiff saw Dr. Goldsmith on March 5, 2008.  Dr. Goldsmith noted the following:

> Mild-moderate tenderness lateral aspect of left knee at lateral collateral ligament.  Recent x-ray report: no evidence of fracture.  No evidence of acute injury.  Patient has only subtle limp and does not seem to be favoring that leg.  Will get MRI and ortho consult.  Also said he needed more pain medication and will give hi[m] 1 darvocet 65 at hs.  Patient is awaiting neurosurgery for his back.

*Motion*, p. 5, ¶ 13 and Ex. A-6, p. 17; *Response*, p. 3, ¶ 13.

23.     Dr. Goldsmith submitted to PHP a request for an MRI of the plaintiff's left knee.  The request was denied because PHP determined that there was inadequate documentation of medical need for the MRI.  *Motion* p. 5, ¶ 14; *Response*, p. 3, ¶ 14.

24.     On April 16, 2008, Dr. Goldsmith again examined the plaintiff.  The plaintiff was complaining of increased back pain, and Dr. Goldsmith noted that an EMG should be performed.  *Motion*, p. 10, ¶ 40; *Response*, p. 7, ¶ 40.  Dr. Goldsmith submitted a request for the EMG on April 17, 2008, and it was approved by PHP on April 18, 2008.  *Motion*, p. 10, ¶ 41; *Response*, p. 7, ¶ 41.

25. The EMG was performed on May 23, 2008, and revealed no evidence of any entrapment neuropathy, polyneuropathy, or any evidence of acute or chronic denervation in the muscles tested. *Motion*, p. 10, ¶ 42; *Response*, p. 7, ¶ 42.

26. The plaintiff was seen again at the Red Rocks Center for Rehabilitation on June 6, 2008. Physician Assistant Terri Thorn and Dr. Jeffrey Kesten determined that "[a] surgical consult is appropriate at this point, but surgery would not be the first choice due to other noninvasive, nonsurgical treatments which have not been performed at this point." Indocin and Neurontin were listed as the plaintiff's pain medications. The plaintiff's left knee pain was documented as "significantly improved." *Motion*, p. 10, ¶ 43 and Ex. A-6, pp. 21-23; *Response*, p. 7, ¶ 43.

27. On July 14, 2008, the plaintiff received an ADA evaluation by Gatbel Chamjock, Physician's Assistant. The following was documented:

> Patient able to walk into and out of exam room normally. Hopped onto and off exam table without difficulty. Spine straight without obvious deformity, appropriate muscle strength bilaterally. Full range of motion in all joints without pain, locking or screpitus [sic]. No swelling or effusion appreciated. Reported tenderness to palpation of Para lumbar muscle bilaterally. No tenderness to spine.

*Motion*, p. 10, ¶ 44 and Ex. A-6, p. 26; *Response*, p. 8, ¶ 44.

28. The plaintiff received epidural steroid injections in his back by Denver Health Medical Center specialists on July 30, 2008; September 3, 2008; and October 1, 2008. *Motion*, p. 10, ¶ 45; *Response*, p. 8, ¶ 45.

29. On December 23, 2008, Webster saw the plaintiff when he complained that the steroid shots were no longer effective. Webster noted that the plaintiff's gait was brisk, his

posture was uninhibited, and his physical presentation did not match his claims that he was experiencing extreme pain. *Motion*, p. 11, ¶ 46; *Response*, p. 8, ¶ 46.

30. On March 13, 2009, the plaintiff sought renewal of his prescription for the pain medication Neurotin. Dr. Fortunado submitted a request for non-formulary Neurotin, but noted that the EMG did not support motor or sensory entrapment, and it was doubtful that the Neurotin would be approved. *Motion*, p. 7, ¶ 22; *Response*, p. 4, ¶ 22.

31. On March 20, 2009, Webster saw the plaintiff in the clinic for Part II of the ADA assessment. The plaintiff stated that he needed more pain medication. Webster noted that the plaintiff's "[g]ait speed test was twice as slow as the first exam" and that the plaintiff "[r]efused Chair Stand Test because of pain," but when the plaintiff left the clinic, he was walking at a very quick pace and swinging his arms freely. *Motion*, p. 11, ¶ 47; *Response*, p. 8, ¶ 47.

32. On April 14, 2009, the plaintiff sought renewal of his prescription for the pain medication Neurotin. Dr. Fortunado documented the following:[3]

> As per recent ADA Mobility eval inmate eval was inconsistant
> with mobility disorder. Inmate was also non complient in
> performing mobility assisment, eg chair test. He was observed by
> webster leaving the clinic with a very quick paced gait good arm
> swing, no discomfort etcf. Thus refills at this time are denied.
> Inmate may kyte to medical if he has issues.

*Motion*, p. 7, ¶ 22 and Ex. A-6, p. 39; *Response*, p. 4, ¶ 22.

33. The plaintiff submitted a kite seeking refill of Neurotin and Baclofen. On April 20, 2009, a physician's assistant documented that on that day, the plaintiff had been observed on a surveillance camera, and "his gait was steady swinging arms walking @ fast pace without

---

[3]I have quoted Dr. Fortunado's entry as written, without correction or acknowledgment of error.

difficulty, when he was in medical he [sat] on the exam table with his left leg swinging." When the plaintiff was told that he would not receive the pain medication Neurotin or Baclofen, he threatened a lawsuit. *Motion*, p. 11, ¶ 48 and Ex. A-6, p. 40; *Response*, p. 9, ¶ 48.

34. On June 5, 2009, the plaintiff sought a prescription for pain medications. Dr. Fortunado documented that the plaintiff stated that he could not sit because of the pain he was experiencing, but he was able to squat without difficulty at the side of the exam table; the plaintiff stated he was in extreme pain, yet he smiled as he addressed passing inmates that he was acquainted with while in the exam room rather than being involved with the discussion of his pain; and he did not grimace, stumble, or move slowly when he changed positions. Dr. Fortunado denied the plaintiff's requests citing a lack of objective findings to support the plaintiff's description and claims of excessive pain. Dr. Fortunado further documented that the plaintiff could request a staff meeting to address his pain medications, but did not know if he would be successful because he has had two negative ADA exams and a negative EMG. *Motion*, pp. 7, 11, ¶¶ 22, 49 and Ex. A-6, p. 41; *Response*, pp. 4, 9-10, ¶¶ 22, 49.

35. The plaintiff alleges that Dr. Fortunado is wrongfully denying him treatment for Hepatitis C because the Hepatitis C Protocol requires him to complete a drug and alcohol treatment program, and he is not eligible to participate in the program. *Motion*, p. 7, ¶ 23; *Response*, p. 4, ¶ 23. Dr. Fortunado explained the clinical standards and procedures to the plaintiff in response to the plaintiff's grievance on June 30, 2008. *Motion*, p. 7, ¶ 24; *Response*, pp. 4-5, ¶ 24.

36. Dr. Fortunado provided a detailed explanation of the DOC Hepatitis C Protocol and treatment options to the plaintiff on May 14, 2009. The plaintiff verbalized his understanding of

the explanation, but continued to express his feeling that the standards needed to be changed. *Motion*, p. 7, ¶ 25; *Response*, p. 5, ¶ 25.

37. Defendant Dowis is the Health Services Administrator for the Sterling Correctional Facility. Her responsibilities are to supervise, consult and educate the SCF medical providers regarding clinical standards and DOC Administrative Regulations. She is responsible for holding the medical providers accountable for the days and hours they are scheduled to work. *Motion*, p. 6, ¶ 18; *Response*, p. 3, ¶ 18. She does not have authority over the medical providers regarding the medications, treatments, or consultations they order. *Motion*, p. 6, ¶ 19; *Response*, p. 4, ¶ 19.

38. Although Dowis attended two medical staff meetings concerning the plaintiff, she did not have any direct involvement in the medical treatment provided to the plaintiff. *Motion*, p. 6, ¶¶ 20-21; *Response*, p. 4, ¶¶ 20-21.

The plaintiff filed his Amended Complaint [Doc. #10] (the "Complaint") on March 9, 2009. The Complaint asserts three claims for relief.

Claim One alleges that defendant Wade was deliberately indifferent to the plaintiff's health and safety in violation of the Eighth Amendment because Wade (a) failed to place the plaintiff in a seatbelt prior to his transport; (b) "drove in a careless and dangerous manner on icy road conditions" resulting in an accident which caused injury to the plaintiff's back and left knee; and (c) failed after the accident to determine if the plaintiff was injured. *Complaint*, pp. 4-4A.[4] Claim One further alleges that defendants Milyard and PHP violated the plaintiff's Eighth

---

[4] I cite to the page numbers of the Complaint as they are assigned by the plaintiff.

Amendment rights because they were aware of the accident the same day it occurred and refused "to investigate for injury" and "examine the passengers." Id.

Claim Two alleges that defendants PHP, Webster, Dowis, and Fortunado were deliberately indifferent in treating his back and knee injuries in violation of the Eighth Amendment. Id at pp. 5-5C.

Claim Three alleges that defendants PHP, Webster, Dowis, Fortunado, and Milyard failed to appropriately treat his hepatitis in violation of the Eighth Amendment. Id. at pp. 6-6A.[5]

### III.  ANALYSIS

This action is brought under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

The individual defendants assert that they are entitled to qualified immunity on the plaintiff's claims. *Motion*, pp. 12-14; *Webster Motion*, p. 3.  Qualified immunity shields government officials from liability for civil damages provided that their conduct when committed did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity not only shields a defendant from unwarranted liability, it also protects the

---

[5]Any other claims the plaintiff may be attempting to assert are unintelligible and will not be recognized.  See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (stating that "[t]he broad reading of the plaintiff's complaint does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based").

defendant from the burdens of defending a suit.  <u>Medina v. Cram</u>, 252 F.3d 1124, 1128 (10th Cir.

2001).  The qualified immunity defense is available only to government officials sued in their

individual capacities.  <u>Buchwald v. University of New Mexico School of Medicine</u>, 159 F.3d

487, 492 (10th Cir. 1998).

When a defendant asserts a qualified immunity defense on summary judgment, a heavy

two-part burden shifts to the plaintiff.  <u>Medina</u>, 252 F.3d at 1128.  The plaintiff must establish

that "the defendant's actions violated a constitutional or statutory right."  <u>Scull v. New Mexico</u>,

236 F.3d 588, 595 (10th Cir. 2000) (internal quotations and citations omitted).  The plaintiff must

also show "that the constitutional or statutory right the defendant allegedly violated was clearly

established at the time of the conduct at issue."[6]  <u>Id.</u>  "A right is clearly established only if there

is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts has found the law to be as the plaintiff maintains.  Only if the

plaintiff establishes both elements of the test does the defendant bear the traditional burden of

showing that there are no genuine issues of material fact and that he or she is entitled to

judgment as a matter of law."  <u>Id.</u>  "If the plaintiff fails to satisfy either part of the two-part

inquiry, the court must grant the defendant qualified immunity."  <u>Medina</u>, 252 F.3d at 1128.

The Eighth Amendment places a burden on prison officials to "take reasonable measures

to guarantee the safety of the inmates."  <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984).  A

prison official violates the Eighth Amendment if he is deliberately indifferent to the need to

---

[6]The order in which I may consider these factors is discretionary.  <u>Pearson v. Callahan</u>,
__ U.S. __, __, 129 S. Ct. 808, 818 (2009); <u>Shroff v. Spellman</u>, 604 F.3d 1179, 1188 (10th Cir.
2010).

protect an inmate from a substantial risk of serious harm.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 834

(1994).

A prison official's deliberate indifference to an inmate's serious medical needs violates

the inmate's Eighth Amendment right to be free from cruel and unusual punishment.  <u>See</u> <u>Estelle</u>

<u>v. Gamble</u>, 429 U.S. 97, 104 (1976).  "This is true whether the indifference is manifested by

prison doctors in their response to the prisoner's needs or by prison guards in intentionally

denying or delaying access to medical care."  <u>Id.</u> at 104-05.  A medical need is sufficiently

serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is

so obvious that even a lay person would easily recognize the necessity for a doctor's attention."

<u>Hunt v. Uphoff</u>, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting <u>Ramos v. Lamm</u>, 639 F.2d 559,

575 (10th Cir. 1980)).  A prison official is deliberately indifferent if he or she "knows of and

disregards an excessive risk to inmate health."  <u>Farmer</u>, 511 U.S. at 837.  "[T]he official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference."  <u>Id.</u>

### A.   Claim One

In Claim One, the plaintiff alleges that defendant Wade was deliberately indifferent to his

health and safety in violation of the Eighth Amendment because he (a) did not place the plaintiff

in a seatbelt; (b) "drove in a careless and dangerous manner on icy road conditions" resulting in

an accident which caused injury to the plaintiff's back and left knee; and (c) failed after the

accident to determine if the plaintiff was injured.  *Complaint*, pp. 4-4A.[7]

---

[7]I cite to the page numbers of the Complaint as they are assigned by the plaintiff.

The plaintiff's allegations regarding this claim are riddled with contradictory and fallacious allegations. The plaintiff claims that he was not examined after the accident for further injury to his back and for injury to his knee, *Complaint*, pp. 4-4A, but it is undisputed that he attended his neurosurgery appointment immediately after the accident--an appointment where a neurosurgeon performed a history and physical examination specific to his back problems, *Motion*, Ex. A-6, p. 9; *Response*, Ex. 3, and he was examined in the SCF medical clinic the following morning for his complaints relating to the accident. *Motion*, Ex. A-6, pp. 10-11.

The plaintiff also claims that after the accident, Wade refused to investigate whether the plaintiff and the other inmate were injured. *Complaint*, p. 4A. Indeed, he attests that "[a]t no time did [Wade] insure [sic] the well-being and health of the passengers." *Response*, Ex. 1 (Savajian Affidavit), first full paragraph. However, in his deposition (taken approximately a month and a half before the date of his affidavit) the plaintiff stated that immediately after the accident, Wade "asked if we were okay, and we said, For right now we are." *Motion*, Ex. A-3, 19:1-6.

The plaintiff also claims that he volunteered to delay his "much needed appointment for safety sake" but his "voiced concerns were disregarded and the officers loaded us into the transport van." *Complaint*, p. 4, second paragraph. By contrast, in his affidavit the plaintiff states that in response to his expressed "fear of the trip to the driver" and suggestion to "reschedule for a better weather day," he was informed that he <u>could</u> cancel his appointment, but that it would not be rescheduled "for some time." *Response*, Ex. 1 (Savajian Affidavit), third full paragraph.

The plaintiff's inconsistent allegations notwithstanding, he has not met his heavy burden to prove that the individual defendants violated his Eighth Amendment rights, <u>Scull</u>, 236 F.3d at 595, nor has he created a material fact dispute regarding whether PHP violated his constitutional rights. The only competent evidence he submits regarding Wade is his affidavit and the affidavit of the other inmate passenger, Glenn Kemp. Both inmates attest that they expressed fear about being transported that day because the weather conditions at the time of departure from SCF included "sub-freezing temperatures," "blowing snow," "icy road conditions," and "poor visibility." *Response*, Ex. 1. However, they both attest that they were given the option to reschedule their appointments but declined to do so. <u>Id.</u>

They also attest that they again expressed their fear after the van nearly rear-ended a semi truck "travelling [sic] at a safer speed that we had been travelling [sic]." <u>Id.</u> This vague and conclusory allegation provides no help to the plaintiff in proving that Wade was deliberately indifferent to his safety.

Mr. Kemp attests that when the vehicle went through the intersection at Arapahoe Road and 13th Street, "we crested a hill after passing through a green stoplight, and both I and Mr. Savajian saw that a series of vehicles had stopped in the road, waiting for a vehicle to obtain a parking space. At this time, the driver . . . realized . . . that the vehicle was travelling [sic] too fast to stop to avoid ramming the stopped vehicles, and we collided with the nearest vehicle." <u>Id.</u> These facts do not prove deliberate indifference. Indeed, it is undisputed that the transport van was traveling at only 25 miles per hour and that Wade applied the brakes in an attempt to stop. The plaintiff has failed to prove that Wade knew of and disregarded an excessive risk to his safety.

In addition, although the plaintiff attests that neither he nor Mr. Kemp were placed in seatbelts, there is no evidence that the plaintiff or Mr. Kemp requested Wade to place them in seatbelts, or that seatbelts were even available in the back seat of the transport van.

The plaintiff also claims that Wade was deliberately indifferent because he failed after the accident to determine if the plaintiff was injured. As noted above, he attests that "[a]t no time did [Wade] insure [sic] the well-being and health of the passengers." *Response*, Ex. 1 (Savajian Affidavit), first full paragraph. However, in his deposition (taken approximately a month and a half earlier) the plaintiff states that immediately after the accident, Wade "asked if we were okay, and we said, For right now we are." *Motion*, Ex. A-3, 19:1-6.

Where a sworn statement conflicts with the declarant's prior sworn statements, the statement will not operate to create a genuine fact dispute if it is merely an attempt to create a sham fact issue. Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986). "Where . . . a party has been examined extensively at deposition and then seeks to create an issue of fact through a later, inconsistent declaration, he has the duty to provide a satisfactory explanation for the discrepancy at the time the declaration is filed. To allow him to preclude summary judgment simply by contradicting his own prior statements would seriously impair the utility of Federal Rule of Civil Procedure 56." Sinskey v. Pharmacia Ophthalmics, Inc., 982 F.2d 494, 498 (D.C. Cir. 1992).

When determining if the declarant is attempting to create a sham fact issue, the following factors are relevant: (1) whether the declarant was cross-examined during his earlier testimony; (2) whether the declarant had access to the pertinent evidence at the time of his earlier testimony

or whether the declaration was based on newly discovered evidence; and (3) whether the earlier testimony reflects confusion which the declarant attempts to explain. Nimmo, 796 F.2d at 1237.

The plaintiff provided his deposition testimony while proceeding *pro se*. As a result, he did not have the benefit of cross-examination by his own counsel. However, the statement was based purely on the plaintiff's recall of the event, and there is no evidence that the plaintiff was confused or otherwise misspoke. See Martin v. Merrill Dow Pharmaceuticals, Inc., 851 F.2d 703, 705 (3rd Cir. 1988) (holding that where the witness was confused or misspoke at the prior deposition, a subsequent correcting or clarifying affidavit could be sufficient to create a material fact dispute).

In addition, the plaintiff provides no explanation for the inconsistency between his earlier sworn deposition testimony and the statement made in his Response to the summary judgment motion.[8] The plaintiff's contradictory statement is provided solely in response to the evidence presented in the defendants' summary judgment motion. For these reasons, I find that the sworn statement is an attempt to create a sham fact issue and, therefore, fails to create a genuine factual dispute regarding whether Wade inquired if the plaintiff was injured after the accident occurred.

Moreover, it is undisputed that the plaintiff was examined by a neurosurgeon immediately after the accident, and that he was examined by SCF medical personnel the following day. A "delay in medical care only constitutes an Eighth Amendment violation where

---

[8]The plaintiff states that "he disagrees with the statement that both of us inmates claimed we [were] not injured, if we did, i[t] was stated during a period of shock from trauma." *Response*, p. 2, ¶ 6. The fact that the plaintiff may have been in "shock" at the time of the accident does not explain why he stated in his deposition that Wade inquired immediately after the accident "if we were okay," but stated in his affidavit in response to the summary judgment motion that "[a]t no time did the Officers insure [sic] the well-being and health of the passengers." (He consistently refers to Wade as "the Officer" in this paragraph.)

the plaintiff can show that the delay resulted in substantial harm." Oxendine v. R.G. Kaplan, M.D., 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotations and citation omitted). The plaintiff has not provided any competent evidence to prove that a delay in treatment caused him substantial harm.

Claim One further alleges that defendants Milyard and PHP violated the plaintiff's Eighth Amendment rights because they were aware of the accident the same day it occurred and refused "to investigate for injury" and "examine the passengers." Id.

As to defendant Milyard, an individual cannot be held liable in a section 1983 action unless he caused or participated in an alleged constitutional violation. McKee v. Heggy, 703 F.2d 479, 483 (10th Cir. 1983). Consequently, respondeat superior is not within the purview of section 1983 liability. Id. In order for a supervisor to be liable under section 1983, there must exist a causal connection or an affirmative link "between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993). See also Rizzo v. Goode, 423 U.S. 362, 371 (1976). Without a showing of direct responsibility for the alleged violation, liability will not be imposed on a supervisory official. Id.

The plaintiff has failed to provide any evidence to show that Milyard was directly responsible for any constitutional violation. To the contrary, it is undisputed that Milyard was told that Wade did not report any injuries based on the plaintiff's claims, Wade's observations, the verbal opinion of the emergency responders, and the professional opinion of the medical staff that saw the plaintiff at his scheduled appointment.

As to defendant PHP, in <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658 (1978), the Supreme Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." <u>Id.</u> at 694. A policy is a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the entities' officers. <u>Id.</u> at 690. A custom is a "persistent and widespread ... practice[] of ... officials." <u>Id.</u> at 691 (quoting <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 167-168 (1970)).

"[I]t is now well settled that <u>Monell</u> also extends to private defendants sued under § 1983." <u>Smedley v. Corrections Corp. of America</u>, 175 Fed.Appx. 943, 946 (10th Cir. 2005) (citing <u>Dubbs v. Head Start, Inc.</u>, 336 F.3d 1194, 1216 (10th Cir.2003)). "As such, a private actor such as CCA 'cannot be held liable solely because it employs a tortfeasor--or, in other words . . . cannot be held liable under § 1983 on a respondeat superior theory.'" <u>Id.</u> (citing <u>Monell</u>, 436 U.S. at 691). The plaintiff has not provided any evidence to create a material fact dispute regarding whether a custom or policy of PHP is responsible for a deprivation of his constitutional rights as alleged in Claim One.

**B.  Claim Two**

In Claim Two, the plaintiff alleges that defendants PHP, Webster, Dowis, and Fortunado were deliberately indifferent in treating his back and knee injuries in violation of the Eighth Amendment. *Complaint*, pp. 5-5C. The plaintiff does not provide any competent evidence in support of this claim. In his affidavit, he states only the following:

As of January 28, 2010, I have not been given an MRI to
determine if any further damage has been incurred to my discs that
had already been diagnosed from MRI imaging examinations.  I
have not been examined by MRI to determine if any damage can
be confirmed as to the claims of my left knee and my neck injuries.

*Response*, Ex. 1 (Savajian Affidavit), p. 2.

These allegations are not sufficient to prove that defendants PHP, Webster, Dowis, and

Fortunado were deliberately indifferent to his back and knee injuries.  Therefore, the plaintiff has

failed to meet his burden to prove that the defendants violated his constitutional rights, and the

individual defendants are entitled to qualified immunity.

Moreover, the plaintiff has not identified any PHP custom or policy that resulted in a

constitutional violation related to the treatment of his back and knee.  To the contrary, the

undisputed material facts show that the defendants were aware of the plaintiff's back and knee

conditions, and they actively treated him for these conditions.

The plaintiff's knee was examined on February 6, 2008 (the day after the accident).  At

that time, there was a small bruise on the knee and the plaintiff had difficulty flexing the knee.

The plaintiff received an x-ray of his knee, and his knee was examined again on March 5, 2008.

No fracture or evidence of acute injury was found.  The plaintiff's knee was examined again on

February 22, 2008.  The knee was found to be stable.  The plaintiff was diagnosed with probable

left patella bursitis, which would resolve with time.  The knee was examined a fourth time on

June 6, 2008, and was found to have significantly improved.

The plaintiff's back pain was addressed on numerous occasions.  He received an MRI, a

neurosurgical consultation, a pain management consultation, an EMG, three separate steroid

injections, and pain medications consistent with his symptoms.

To the extent the plaintiff disagrees with the diagnoses, medications, and treatments provided to him and insists that he should receive surgery and Neurotin for his back and an MRI for his knee, "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." <u>Perkins v. Kansas Dept. of Corrections</u>, 165 F.3d 803, 811 (10th Cir. 1999).

### C.   Claim Three

Claim Three alleges that defendants PHP, Webster, Dowis, Fortunado, and Milyard failed to appropriately treat his hepatitis in violation of the Eighth Amendment because they have not provided him with a medication called Interferon.  *Complaint*, pp. 6-6A.

The undisputed material facts reflect only that the plaintiff alleges that Dr. Fortunado is wrongfully denying him treatment for Hepatitis C because the Hepatitis C Protocol requires him to complete a drug and alcohol treatment program; he is not eligible to participate in the program; Dr. Fortunado explained the clinical standards and procedures to the plaintiff in response to the plaintiff's grievance on June 30, 2008; Dr. Fortunado provided a detailed explanation of the DOC Hepatitis C Protocol and treatment options to the plaintiff on May 14, 2009; and the plaintiff verbalized his understanding of the explanation, but continued to express his feeling that the standards needed to be changed.

The plaintiff has not provided any evidence to prove that the individual defendants violated his Eighth Amendment rights with regard to the treatment of his Hepatitis C, nor has he provided any evidence to create a material fact dispute regarding whether PHP is responsible for a custom or policy that caused a violation of his Eighth Amendment rights.  Therefore, the

individual defendants are entitled to qualified immunity on Claim Three, and PHP is entitled to summary judgment.

## IV.  CONCLUSION

The plaintiff has not met his heavy burden under <u>Scull</u> to prove that the individual defendants were deliberately indifferent to his safety and medical needs.  Therefore, these defendants are entitled to qualified immunity on all of the plaintiff's claims.  In addition, the plaintiff has failed to create a material fact dispute regarding whether PHP had a custom or policy that caused a violation of the plaintiff's constitutional rights.  Accordingly, I respectfully RECOMMEND that the motions be GRANTED and that summary judgment enter in favor of the defendants on all of the plaintiff's claims against them.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.  A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. <u>In re Key Energy Resources Inc.</u>, 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  <u>United States v. One Parcel of Real Property</u>, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated July 22, 2010.

BY THE COURT:

 s/ Boyd N. Boland_____
United States Magistrate Judge